Here to give you, here to give you, here to give you, this Honourable Appellate Court from the 2nd Judicial District is now back in session for suit and adjournment. The Honourable Constable Steve Hudson, please rise. Thank you. Please be seated. Good morning, everyone. Good morning. Your Honour, this case will be adopted. 2-17-0084. To the authority of the International Ministries, and all plaintiffs' government, the City of Rockford, and the Appellate Court, the Honourable Counsel, Mr. Craig, and Mr. Sandberg, the Honourable Appellate Court, and the Appellate Court, Mr. Dunlap, Mr. Dunlap. Good morning. Counsel, these cases were not actually consolidated. Do you have any preference as to how you'd like to argue those? I don't, Judge. It can be however Your Honour prefers. I think what happened was there was a certain deal that got filed on the same day. Instead of going across the field, I generated for all of us that way. So I think to the extent that Your Honour is interested for us to answer the questions, as opposed to arguing these things, there are increasing problems in the matter. We'll interject as far as we can. Counsel, what's your preference? No preference at all, Judge. If there's any questions, and if it's contained in the response versus the appellate brief, we'd be fine with that. In light of that, let me just make the suggestion, subject to concurrence, that you'll present your argument. You are the appellant, right? Yes, in the first case. Right. You can argue whatever you want in the course of it. You can argue whatever you want and then rebuttal. I mean, it's because we're talking about it. You have alluded to the same parties and essentially the same case, some of the same facts. So with those thoughts in mind, you may proceed. May it please the Court, Counsel? This incident that took place almost eight years ago at a church up in Rockford really affected the community. And out of it arose a case that originally began as there were federal claims and then state claims, and they were consolidated in the federal court. The federal claims were dismissed, and that's how it ended up back in state court, pursuing only state law claims. One of the things that took place early on in the case once we got to the state court, because all of the discovery had been done, was there was a motion for summary judgment that addressed a number of the claims. And for purposes of Your Honor, the primary claim that was dismissed on summary judgment when the Court granted partial summary judgment that I want to talk about is the negligent retention, which, as I indicated in my brief, I believe was wrongly decided by the Court. As Your Honors know, the statute that's being relied upon by the city of Rockford in order to assert effectively affirmative defense is 745 ILCS 10-2-201, which says, except as otherwise provided by statute, a public employee serving the position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion, even though abused. This is at page 30 of my opening brief. Do you agree that the retention here would be discretionary? Certainly. Obviously, the decision-making here, whether it's retention, hiring, firing, all involve a discretionary act. There's no issue. The issue might be then what balancing competing interest policy considerations were at issue? Perhaps. I think the larger issue, Your Honor, is that when the statute was implemented, the idea behind it is to immunize those people that are making decisions related to policy from being subject to litigation when it's just a bad decision on policy. That's going to happen from time to time as administrations change. There will be people that will want to challenge those from time to time. But it matters about what the decision is for. And I don't think in the context of the retention, the hiring, the firing of Oda Poole, Stan North, it's related to any type of policy. Certainly, there's no evidence in this case that the city of Rockford put forth in the record that there was some policy for why they chose to retain him, why they chose to hire him. Specifically, the concern, I suppose, is about Oda Poole, which is not the first time that issues related to Oda Poole has been before this Court. And there's a decision related to the administrative matter that was attached as a Rule 23 because there were some facts that were found by the Court that I think were relevant and subject to this. So let me ask you this. You've read the old Haranek case and Harrison cases. One was a fire marshal. The other was a principal. Are you familiar with those cases? I am not. In those cases, it was held like a fire marshal balancing interests of efficiency and safety or a principal balancing the interests of one student with that of another. The argument would be the city made a judgment call when it balanced an individual's safety in a police encounter with the efficient administration of public safety. So why wouldn't Section 2-201 apply under that case law? Well, as perhaps an initial matter, is that there isn't anything in this record about policy from the city of Rockford. So as to why they chose to retain Oda Poole or why they chose to hire him in the first instance, there isn't anything contained in this record about how Rockford perceived it to be a policy, how keeping this, I would argue, problematic employee on the rolls was part of the larger policy decision that the city of Rockford has. So I don't know specifically about those cases what had been developed in the record or if it was a determination by this court reading the TLEAP suggesting that there was some underlying policy. So basically you're saying the evidence in the record just isn't sufficient to support that conclusion? Simply not clear, is that what you're saying? I certainly think in this case that there isn't anything in the record that would support that this is a policy decision. I'm not sure why that's the case. It just isn't. Is there anything to support that it was an exercise of discretion on the part of the city? Well, as I answered with Justice Hutchinson, I certainly think that this hiring, firing, retention are always discretionary unless there's some necessary component that makes it nearly performal where they just have to do something because something has happened, it's obviously a discretionary act. So I don't mean to be picking apart the statute, the language, but we have to go to the statute and what it is specifically immunizing. And in this case, I believe that as it relates to retention, because there is an evidence that there was a determination of policy that was driving this, that that's why the court erred in granting summary judgment on the negligent retention claim. That's not to say that if your honors were to agree with me that it was an error and there was some type of revamp directed at the circuit court in order to develop a record as to that determination, that something might change or might not change. I just don't know. I just know that the record here that the circuit court relied upon in order to reach its conclusion could not have permitted it to reach the conclusion that this was driven by a policy determination. And I think that the two cases that the parties are primarily relying upon, including the Stratford case, the different panels that had decided those cases that were primarily relying upon, I think sometimes this, what has been clearer in some of the Supreme Court law, that it has to be a policy determination. It's not merely a discretionary act. It's not merely by a discretionary policy decision maker, but it has to be driven by indetermining policy. So unless your honors have any more questions on that, I'd like to move on to the next issue. It is a small issue, but I think the court was in error in denying the ability to amend the complaint. In this particular case, there is no question that the evidence that had been developed at all times is related to willful unconduct. And what we had sought to do on the eve of trial, admittedly, was to clarify one of the theories that had been advanced throughout the case, and that was in addition to those claims that had been specifically articulated, that there was an overarching allegation that the city of Rockford was willful and wanton. We think that that was also shown through the evidence. And so even though there wasn't a formal claim that had been pled before that, we think it was an error in not allowing us to advance that. When did you move? Was that on the first day of trial? When did you move to amend it? I believe it was the first day. It was certainly – yeah. Whatever constitutes a trial, it was when we were proceeding inexorably to trial. So the question would naturally become, why did you wait until the day of trial? And I know that that was city of Rockford's argument, that this was something that was available earlier. And I think our counterargument to it, and it's what I would stand with today, is that they knew that this was a theory, even if it weren't articulated specifically. Not unusual, some theories over time get clarified and complaints get amended on the eve of trial. It wouldn't have changed anything. There wouldn't have been any additional discovery. There would have been no harm, no foul, no prejudice to the city of Rockford. Well, there – I think somewhere in the arguments is the position that if Woelfel and Wanton were – even though they knew and that was generally what you were going to be attempting to prove, without it being a specific allegation, they would be able to deal with a contributory negligence issue. Now, could they have introduced contributory negligence even in a – if Woelfel and Wanton had been alleged? Okay, so now we're going to move on to one of the other issues I had raised, which is whether or not it was okay for – although the plaintiff had to prove Woelfel and Wanton to permit the contributory negligence against my clients Sheila Brown and Marcia Brown for simple negligence? Well, I mean, they're tied together, aren't they? Sure. The amendment was at least perceived to be an effort to prevent Rockford from introducing the issue of comparative or – I'm sorry, contributory negligence. Was that – Oh, I don't think that was it at all. I think that – because I think that they have alleged that as an affirmative offense. Certainly, that's one of the things that they were permitted at trial to allege. And specifically, you know, we don't know with any certainty as it relates to Marissa, but we know with Sheila Brown the jury found that she was partially contributory negligent, not Woelfel and Wanton or anything like that. And as far as Marissa Brown where the jury found not guilty, unfortunately like in criminal cases where, you know, they're not necessarily exonerating saying the person didn't do what they are being charged with. They're only – the jury's only asked to find are they guilty or not guilty. Has the state proven its case? Similarly, with regard to Marissa Brown, we don't know whether or not the case wasn't proven or they just believe that she was more than 50% at fault. All right. Let's then go back specifically to the amendment. It was prohibited on that first day of trial. Discovery had been closed for at least four months. Sure. Why didn't you at the end of the proceedings make a motion to conform the pleadings to your proof? That was certainly in part the argument is that, oh, you mean at the end of the evidence? Yes, which was something – I mean, you could have made the motion. I'm not sure it would have been granted, but you didn't even make the motion, did you? I understand that, yeah. I think given the way the court had – given the approach that the trial court had taken with regard to our requesting leave to amend the complaint and given the fact that it was our position that there isn't any different new evidence that would have been elicited from Discovery, we just didn't renew that motion or seek leave to bring the pleadings in line with the proof, because that was similarly argued earlier on, I guess. I'd like to move on a little bit to – unless there are any more questions I need to address. What is the prejudice? Well, certainly, I think – I'm talking about the leave to amend. Right. As I'm sure Your Honor knows, a basic, simple Wolf, Wong, Watton count is a much more – it's a broader spectrum that can be encompassed within that as to what conduct may be found to be Wolf, Wong, Watton and what are the resulting injuries. Given the fact that what went to trial was primarily the infliction of emotional distress, Wolf, Wong, Watton conduct would have been a broader spectrum claim, alternative claim. I'm not sure whether or not it would have changed the outcome. Obviously, that's one of the issues that I have, I'm sure Your Honors may have questions about as it relates to my concerns about the testimony of the experts and the fact that they were permitted to testify and yet we prevailed. So what's the harm as to that? But I think, Justice Spence, as to your question for what's the harm, the harm I think is that – and the prejudice is that we would have been able to allege a broader swath of conduct that may have fallen within what constitutes reckless. Or because it's Wolf, Wong, Watton, it would be non-intentional. It would be the non-intentional aspects of Wolf, Wong, Watton conduct which would include recklessness. Now, the jury was instructed on the negligence issue and those types of things. But do you think they would have grasped the difference in a jury instruction between Wolf, Wong, Watton and just general, you know, what you had to actually prove because you couldn't plead differently? Right, so I do think they would have. I think in this particular area, it's been my experience that the jury instructions, when the trial court gives all the jury instructions and we as attorneys argue those jury instructions, as a general proposition, the juries understand them pretty well. And so I don't think that there would be any confusion in this particular case. I'm not sure that the jury was confused. And these were similar instructions, though not identical instructions, to those that would have been given in the event that there was a single claim for Wolf, Wong, Watton conduct. But I do think the plaintiffs were prejudiced by not being able to simply argue that as a claim. I'd like to briefly, because of my time, talk about the contributory negligence. I think, as my brief points out, there is perhaps, I think, a lack of clarity as to whether or not there's some reciprocality that is required when there's a contributory claim by a defendant against a plaintiff, where we have to prove someone is Wolf, Wong, Watton, and the defendant merely has to show that there is simple negligence. There is a lack of parity or reciprocality that I don't believe is supported by the case law. If we take a broader look at that case law, I know that there is case law out there that does support that. But obviously, when you represent plaintiffs and you have the heightened standard in order to prove Wolf, Wong, Watton against a municipality, for them to turn around and argue that simple negligence is somebody breached their obligations of exercising ordinary care, that's an incredibly onerous thing to have to address. But should it somehow, the fact that your client is not a municipal entity and your defendant is a municipal entity, isn't that just sort of the, I don't want to say luck of the draw, but that's how you frame your lawsuit? And there are different standards for those parties. Well, I think there's something distinctly different about contributory negligence. And if we were to dial it back and take it out of the context of where there's a Wolf, Wong, Watton, when it's a car accident and it's just arguments that have got to show more probably true than not true that someone violated their obligation, their duty of exercising ordinary care, it makes sense for that driver, who I say was at fault, to turn around and say, yeah, but this lower standard, this ordinary care standard is applicable to you counter defendant plaintiff. But in the context of this, I'm not sure I agree that the luck of the draw then determines that the city of Rockford, in this particular case, then gets to argue this lower standard. Well, counsel, let me ask you sort of a point of question. Are you familiar with the Supreme Court's decision in Poole? Yes. And does Poole go against your position? I think as a general proposition, yes, if we were to look to the specifics of some of the language of Poole. But I'm not sure that given some of the, I'll point out, for instance, when we look at, let's see, Poole is 85. As I put in my argument on page 41, I think that there is arguments that were contained in languages contained in Burke that wasn't overruled by Poole, in my mind, but Poole didn't really meet some of the allegations or some of the support that Burke had. Well, let me ask you, I think Poole, did Poole not ultimately hold that a plaintiff's contributory negligence could be compared with a defendant's whole form of misconduct where the defendant's conduct was reckless but not where the defendant's conduct was intentional or was a dissent? But I mean, that's the basic polling of Poole, isn't it? I agree. But I think that the dissent kind of highlighted the concern about the findings, and so to the extent that I'm here before you seeking a change in the law, I would be moving in that direction because I think that the prior statements made by the Supreme Court, including in the dissent that you referred to, support that. Well, you do understand we have absolutely no authority to change the Supreme Court decision. I understand, and I have every obligation to my client to articulate, raise it, and suggest to your honors that there's a change in the law that is required. I know my time is used up. What was the contributory negligence alleged? Okay. Generally, I think that the city of Rockford's suggestion was, as it relates to Sheila Brown, that she was contributory negligent by allowing Mr. Barmore to get into the church and... Who opened the door? I thought the young boy opened the door. So I'm not sure that the facts are totally clear about what exactly happened. I'm not sure that Sheila actually knows whether or not the door hadn't closed all the way or it was opened by somebody. But that's how Mr. Barmore got into the building, and that was the catalyst then for Officers Poole and North to get into the building. So I think, as it relates to Sheila, that was part of it. As it relates to Marissa Brown, I think that the arguments that the city advanced in support of their contributory negligence claim was that she didn't have to be in the basement when the officers were there. She could have not followed. She could have not participated in the way that she did in her parents' church to go see what was going on to serve a role, and she should have extricated herself and she wouldn't have been a witness to the homicide. What were going to happen? I mean, I know there were two other supervisors in the basement or two other... Right, so there was Sheila and then there was the other plaintiff. Another person, Beatrice or something. Yes, Beatrice. And how many children at that point? About 13, 13 or 15. So there were children there, there were responsibilities there, and the city, I suppose I can ask the city this, but the city's concern was that she went down there to observe the murder as opposed to going down there and taking care of those children? Well, I certainly don't think that the city is going to say that she went down there to observe the homicide. I think that she didn't have to place herself in proximity to that event. But, again, we don't know because, in this particular case, because they could argue that and the jury doesn't have to come back and say, we find her 51% contributory negligent. We don't know whether or not. We didn't have any special interrogatories. I think there were special interrogatories. I'm not sure that there was. On this issue? On this issue, there was not. Okay. You say there was not? I don't believe on this issue yet. And as to the, if I can just have one final statement, on the issue of the experts, I think that there's a big concern because we're always concerned about what effect someone who is there, what their testimony may play a role on. And because we can never get into the jury's heads, I don't know whether or not, in this particular case, that the presence of those experts, who I think were so wrongly permitted by the trial court to have been there, in violation of every 213 aspect. Well, had your client done 213 interrogatories? Had we, right. Had you sent them out to be answered by the city? Right. So that's hitting at the heart of the city's argument. Is that a condition preceded to your argument that you would have had to have done that? Well, I. Before you could ask for the card? All right. So the position that I have is the court ordered 213 disclosures. So I'm not sure that in the face of a court order, that it remains a condition preceded for me to formally serve 213 interrogatories. So that would be your position. The court order was there, so ordinarily, perhaps, by the way of the court order, you're seeing it. Your argument would be perhaps redundant that you would do this. It certainly would be redundant. And that was certain cutoff dates. Is that what it was? Yeah. Regular witnesses by such and such a date. Experts by such and such a date. Right. So I think, to give the court just a general understanding about what had happened, because I think it's important in the context of this, everything was done in federal court before we took a dismissal on the federal claims in order to refile only the state claims here. Everything was done. And so when we finally got assigned to our judge, there was initially Oda Poole and Stan Northwood, different attorneys. Everybody had substitutions, and then eventually that's how we ended up with Judge Young, who wasn't even sitting in Winnebago at the time. He was in Belvedere. But one of the initial orders, I believe, that Judge Young had entered was a disclosure of trial-ready 213, that type of thing, so that everybody knows who is going to be presented and what are they going to testify about and what facts are they going to testify about, what opinions are they going to testify about. And so the parties submitted their answers to Rule 213. And part of the Rule 213 that the city of Brockford had was they referenced these individuals, Martini and... Martinelli. Right, Martinelli, and referred to depositions and opinions that were held in the still-pending federal case, where our case was done. In the federal case, Martini and Martinelli were disclosed under the federal rules and their depositions were taken. And that's what the reference in their answers to interrogatories are. There isn't an affirmative obligation that I have to chase down opinions. The Supreme Court Rules 213, as it relates to F1, 2, and 3, articulates with specificity what's anticipated and expected of someone when they're disclosing interrogatories. Well, had they been deposed, were you in that case? Right. Were you in the federal case? Yes, but we were out of the federal case and in state court when Martini and Martinelli were disclosed as experts by the city of Brockford. We were no longer participating in any form or fashion in the federal case when those individuals were disclosed or when their depositions were taken. So you didn't participate in the deposition? At all. Did you have the transcript of it? We didn't. We didn't have anything. We weren't involved in that federal case. We never sought them, obtained them, knew about them. There is the disclosure, but I don't have an affirmative obligation to chase down what they have an obligation to disclose under 213. F3 says with specificity I have to know who it is, opinions, basis, what was relied upon, all that, and that's not contained. And so I was able, I believe, I was permitted to stand on the rule and then move to bar them for noncompliance with 213. Could you have moved to take their deposition? At any time? Well, once you're in state court, once you're in the state court system and they've been disclosed as General 213 witnesses, could you then have moved to take their deposition? Absolutely. I could have taken their depositions to find out for the first time what is the opinion because it's not contained anywhere in the disclosure. Actually, refresh my memory, would you have had to have leave of court to do that or could you have just slapped a deposition subpoena on them and taken their debt? Well, because they were a retained expert, I could have just said, hey, City of Rockford, I want you to produce this person so I can figure out what their opinions are because you haven't disclosed their opinions to me pursuant to the rule. But instead of that, we relied upon the rule, relied upon that every opinion that they intend on eliciting is contained within the disclosure. It happens all the time in cases where people use 213 and try to wrangle in someone's opinion so it's not more far-reaching than... And what date did you move to bar them? Oh, it was at trial. At trial. Yeah. Which also could have been done at an earlier date. I completely understand. I could have, at lots of opportunities, done something to try to figure out what has never been disclosed to me. They only disclosed the individual. They haven't disclosed an opinion. They haven't disclosed a basis for an opinion. They haven't disclosed what they reviewed. All of that information, I'm quite sure, because it was later produced to us, before they testified, it was produced to us on the eve of trial, their report and their deposition. When did you get the report? I think it was after we had moved to bar them, I believe. After the trial had begun? Yeah. Okay. Mr. Sandberg, we've given you about double the normal time to consolidate. I think at this point we need to turn to Mr. Moe Bannon. Thank you. And you have the time letter as well. Sure. Good morning, Your Honors. Counsel. May it please the Court, I'm Yvonne Moe Bannon. I represent the city of Rockford. If I could start with certain questions that were raised when counsel for other plaintiffs was speaking. First off, there's a question as to what constitutes the contributory negligence on the part of Mrs. Brown, Sheila Brown. At trial, the testimony which the jury accepted was that she said, I passed through the door, I did not lock it. It was a daycare, I understand. I had an affirmative obligation to lock the door because a daycare is in this location, but I did not lock it. So there's no one else that passed through the door. So more likely than not, it was my responsibility for that this guy entered the building. So that's where the testimony of- Are you saying she sort of acknowledged that in the testimony? She did acknowledge that during cross-examination. There's another question as to- Was her husband outside that door at the time? Simple answer is yes, but was not standing right outside. The testimony was that he was somewhere on the premises, but he was not standing right outside the building. But the police officers, when they went by, and then I think everybody uses the word whipped the vehicle back around, saw them standing outside near the front of the building, and I think in general proximity to that door, correct? Correct. The next question that was asked, which I want to answer, is as to whether there were special interrogatories. The city presented the trial court denied the request for special interrogatories, and we chose not to appeal on that issue. As to- Did the plaintiff submit a special interrogatory? No, no justice has. Okay, thank you. Would the special interrogatories have related to this issue? It was just this issue you had offered them on? To be honest, I don't remember. There were several of them. I drafted more than 10, 15 of them. So to say specifically whether this was one of those, I would say I can't remember as I stand here. Thank you. As to the negligent retention claim, I think that the plaintiffs and counsels are trying to read the statute very narrowly, and I don't think that's necessary, especially in an area that this court has spoken on in the Johnson case and also in the Statman case. The Johnson case, which the trial court relied on, which I believe is directly on the point, personal injury claim regarding an off-duty police officer, the court looked and said a position as to who to hire, who to fire as a police officer, who to retain, it's within the premise, the province of the chief of police, and that this particular immunity applies. All right. So what is the policy? Is the policy the chief of police has to run his or her department in the best way possible, or is there, I seem to, I thought I saw references to this was a policy decision to keep as many police officers on the force and, you know, maintain order throughout the city. I mean, I'm not sure what the policy is that's been relied upon. Based on my research and looking at the area, Justice Hutchinson, my understanding of the policy is that it's the chief of police that gets to determine, based on the number of officers I have, does it match the needs of the city, do I need to let some people go, do I need to keep some people, as to the general number of officers that I need and how to generally deploy them. And the concern which the court, not just the trial court, but I believe also the Johnson court, considered was the fact that if you start to second-guess the chief of police as to such, for lack of better word, minutia, it may not really all go on. It would run counter to what the General Assembly thought about  But if the issue is I have to maintain a certain amount of law enforcement in order to maintain, you know, the peace and quiet, as it were, within the city, I'm assuming, well, I guess I shouldn't say I'm assuming, but police departments hire and fire officers all the time because lots of people want to be police officers. There was no way expeditiously to replace these officers if necessary. I mean, I don't, I still, I understand what the spoken purpose of the policy is. I don't understand how it could not otherwise be fulfilled with finding new officers or finding persons to replace officers who may not have the trust of the community, and that's rather critical to law and order. I understand that line of argument, but I think that speaks more to the discretion arm of the immunity where the chief of police gets to look at a specific officer and say, and look at a specific incident and say, is this something I need to fire this officer for? Is there some redeeming value in this officer? Is this someone that we can train? I think that speaks more to discretionary aspect of it, but also I would admit that even in the case law that we have, the Johnson case, even in the, I believe it's the Stratton case, which counsel refers to, the policy aspect of the immunity was not fully discussed by the court, and I think that discretionary part of the immunity in this particular case suffices, and I think that the district discourse precedence suffices for the purpose of this case. In your motion for summary judgment on this issue, what specifically did you allege? Why did you believe that there were no issues of material fact and that this count should be dismissed? If I recall, it's been a while, but if I recall, there were no facts that speak absent this particular incident. The negligent retention presupposes that there were prior incidents which would, I suppose, inform the employer that, hey, this officer is someone we shouldn't have in the department, and those prior incidents should give you clear notice where one could say the duty would have accrued to act in a certain way. So I believe that to that extent, there was just no facts of support, conduct, which a reasonable person would look at and say, hey, this guy should not be part of your department, and you kept him on your force. As to the counsel who speak to this, but I just mentioned it, there was also a challenge of the tortious interference of economic advantage claim. We just didn't see how that – any basis to reverse the law court on that. There was no facts of support that there was even any contract between the church and the council. But that would also occur in an intentional attempt to interfere, would it not? That is correct, Judge. This is not just – this is just trying to put a round peg in a square hole, and this is not what that course of action is for. And we ask that the trial court's ruling be affirmed on that. As to – I'm turning to the leave to amend complaint. A source of concern for the city at the time, and which we're grateful the trial court saw, if you want to intersect, this was a seismic shift in the position of the plaintiffs. For background, plaintiffs had dismissed the individual officers, so at this point we just had – although dismissed them, but we still have a vicarious liability against the city. They now tried to amend the complaint and include a direct claim against the city. That would significantly prejudice the city for a number of reasons. There's no discovery that's been done on that because now we're not quite sure what they're trying to show. We've already had problems with the complaint as it is for lack of a factual basis. As to the musical liability, and that would seriously prejudice the city. It wasn't what we expect in the first day of trial. And this is a case where we had trial dates set months in advance. We had a pretrial conference where we went through motions in limine, and the court was very, very accommodating as to what counsel wanted to do. And it never came up. It never came up until that morning. Counsel makes a lot of – tries to make a lot of the fact that there's supposedly no prejudice on the part of the city. However, neglects to speak of the lack of diligence and timeliness on their part for bringing that motion to amend. It could have been a last minute strategy, but counsel mentioned here and argued that this is a case that started in federal court. It started in federal court several years early, and yet after so many months and so many years, they're still working on the strategy the first day of trial should not be the day that plaintiffs should switch around. Now, the standard overview of that trial court ruling is abuse of discretion, is it not? As to the amended complaint, that's correct. We would have to find the trial court abuse of discretion. That is correct, Judge, and I don't believe there's any – that there is any or even enough to get that far to say that the trial court abused its discretion. What would the city have had to do – you say it was a seismic change. What – how would the city's strategy or what would the city have to present differently than it did if they were allowed to amend? Your Honor, I believe what we would have had to do would be to demonstrate some municipal action. If for some reason – I suppose we would have to show that these officers were properly trained, that this is not – they were qualified officers. We would have to kind of get into their background or some municipal action showing some sort of indifference because the case, as it stood before the jury, was these officers did X or failed to do Y. At that point, there was nothing that the city – there was no lack of supervisory – some sort of supervisory liability. They had nothing like that. But bringing in the city directly, I believe, will now speak more to going beyond the two individual officers, getting to maybe to the supervisors and possibly further. And I think it's something that we needed to make sure the jury doesn't get confused on because that's the case the jury just saw. These two officers and what they supposedly did. As to the two experts that testified – or were allowed to testify over plaintiff's objection, I'll be the first to agree that the – how they were disclosed, the specific language in the document disclosing it was not the best. Maybe because I did it myself, I'll be the first to admit that. However, I don't believe that counsel's argument carries today. And I speak from personal experience that the court wanted to – the trial court understood that this is a case that started in federal court and said this is now state court. I know you guys took a lot of depositions and took a lot of discovery in federal court. But I just want to make sure that because we have new claims, we set these deadlines to ensure that you have everything you need before going to a trial. We have more than 10 defendants – 10 plaintiffs, to make sure everything is all okay. The deadlines for the disclosures for the court used Rule 213, F1, F2, F3. I believe that's short-form weight witnesses, opinion witnesses, independent witnesses. That's essentially what the court meant. But it was a court order. This is some sort of case management order. And personally, I met the court deadline. I recall I had to file motions to compel, to get plaintiffs to meet that deadline. And if I were in the position and I looked at some disclosures which I felt did not meet the standard or meet what I wanted, I would have gone after them and said, hey, give me more information. Or I want to take this guy's deposition or the other guy's deposition. But they chose not to do that. I believe that it was some sort of case management on their part to try to give trials to these two witnesses. And I think the trial court saw through that and denied the motion to preclude them from testifying. When you answered the trial management order indicating who your witnesses would be, did that identification include any affiliation of that witness, either Mr. Martini or Mr. Martinelli? Like, were they affiliated with the Almanac State Police or things of that nature? I would say yes, because there were some other, for lack of a better word, independent experts from the state police. So for those we indicated, you know, state police, reconstructionists, Illinois State Police, ballistics experts, DNA experts. For those, I don't believe I did that. So I think that kind of speaks to the fact that they were not affiliated to any state agency. But, I mean, were they both independently employed, or did they work for, did one or both of them work for entities that did this type of work? Were they employed by universities? I mean. They had some sort of consultancy, and they both worked for the same firm. What was that identified in the actual answer? So-and-so Martini, Hutchinson Agency. Martinelli, Hutchinson Agency. I couldn't tell you just right off the top of my head. I'm sorry. I just don't remember how I did that. As to the, there's no argument as to the limiting of the cross-examination of Dr. Martinelli, but we believe that the records bears out the transcript clearly states that it was the counsel for the other plaintiffs who were no longer part of this case whose cross-examination was limited. I don't think that this thing gets you to jump on any objection that a party who's no longer in this case has. Counsel, you're also contesting, as I understand, the jury's verdict in favor of the plaintiffs on account one. Yes, Judge. And the reason you're doing that is because you don't believe bodily harm was established? Or what's your argument? Judge, our bodily harm argument goes to our challenge of the Sonny judgment. But speaking to the jury verdict, to ask you a question directly, we believe that the jury misunderstood, misunderstood their instructions because they found for the city on count two, which is intentional conduct, and if the actions of the officers were not justified, the jury did not accept self-defense, affirmative defense, we don't believe they would have found for the city on count two being the intentional conduct. I believe that if they were acting in self-defense, they could not have been reckless in their conduct. And it's the recklessness that is the main act which supposedly caused this emotional distress. So that's the main thrust of our argument against the jury verdict. To get there, though, wouldn't we have to place ourselves in the position of the jury and somewhat invade their province and their thought processes and all that? Well, our position is that they should us enough to support that confusion. They accepted the self-defense, affirmative defense. They did not accept the testimony of Marissa Brown, whose testimony essentially is this young man is walking out and the officers stood and shocked him as if he were, as he was standing, hands up and all of that. They did not accept that. And when you set aside that testimony, the only testimony that's left is the testimony of the two officers and the testimony of the forensic experts, which essentially lines up with the testimony of the officers. So we believe that the jury has shown us enough to indicate that they seem to be confused. Another thing which wasn't really raised in maybe the briefs, but it was clear on the record, the fact that the awards seem to be exactly the same amount per number of the plaintiffs, even those who testified, those who did not testify. We believe that's an indication that the jury did not follow its instructions. Couldn't, I mean, under the circumstances, couldn't the jury, I mean, there was some question about whether Mr. Barmore was a barricaded suspect or a not barricaded suspect, I think. I don't know if that was actually before the jury, but there are some general policies that would be used in pursuing, pursuing persons like Mr. Barmore in circumstances like a church. It's clear that they, that officers knew this was a church, correct? Yes, when, when they stopped just moments before they went in. What's not clear or maybe it's clear, but they didn't know the magnitude of the fact that it was also daycare. Is that correct? That is correct. They found out as they, well, one opened the door and found the infant sleeping and then went down the stairs and there was a child who actually pointed him in that direction. That's correct, Judge. Okay, and Mrs. Brown said, well, the babies are down there. You've got to be careful, something like that. I saw some words along those lines yesterday. All right. One of the experts said that officers, well, he'd written an article, officers in foot pursuit often as they get further into the activity, they tend to lose their ability, what is it, to make a rational decision. Couldn't that be considered, and the jury heard that, I believe, in the testimony or the cross-examination of one of the experts, I think it was Martinelli. I believe that's right. So couldn't they have determined that, in fact, based upon that, it was reckless for them to not wait for backup so that they weren't confused at all? I mean, it's possible, but I think that the fact that when the officers got to the basement and saw where Mr. Baltimore was and gave him instructions and the way he reacted, I believe the jury also heard the forensic evidence that supported that Mr. Baltimore was the aggressor, grabbed the officer's gun, was fighting with the officer, and it took several bullets to get him down. Even if the jury believed that, why would that be inconsistent with defining that it was a chain of events, and leading up to this, the officers were still acting somewhat reckless? Why is the finding in favor of the officers on the shooting, why is that inconsistent with the finding of reckless at some point? Our view is that that would essentially be the inconsistency would essentially lay in a finding that the defendant officers or the officers were recklessly acting in self-defense, and that's our position. I don't think it's novel or maybe not very articulately put, but that's our position. We believe that there is some tension, there is some inconsistency between finding that these guys are acting in self-defense and also that they were reckless. But generally, we would tread lightly in overturning a jury's verdict unless we find that kind of a pamphlet. That is correct, Justice. And as long as there is some evidence to indicate that that verdict could have been rendered, we really should accept that as opposed to invade the province of the jury, as Justice Spence has indicated. That is indeed the law, Justice Hodges. I think your time has elapsed. Unless you want to wrap up on something? As long as I can come back and present, we can do that together. Thank you very much, Justice. Mr. Savage, you have a big time to move on. So, Justice Hudson, I think you hit the nail on the head as far as the cross-talking that was occurring between the city of Rockford's position where they were trying to make the plaintiff's case as narrow as possible, which was in that moment, if you accept Oda Poole's testimony that he grabbed his gun, whether or not that was the recklessness.  The jury heard the whole chain of events, and they were trying to consider the whole chain of events. Right. And the theory that got the jury's verdict was on the reckless infliction of emotional distress. As far as counsel's suggestion that there was an acceptance of the self-defense that would have negated the intentional infliction, similar to what I said before, we don't know how the jury reached that conclusion. It could have accepted self-defense, and that would have, I'm not sure that that was borne out, but they could have just said, you know, Craig, you didn't prove your case on that. So I think that that's kind of a non-starter. As to the J&OB, which was the primary issue that counsel was discussing just a moment ago, as to his brief, I do think it's important for this court to speak to whether or not this was ever a proper J&OB. I understand that Judge Young made a statement in his order that I listened to the facts and I was familiar with the three weeks of testimony and all the witnesses, and I just don't think this is J&OB. But I also think that it's important in the context of when you're challenging the sufficiency of the evidence, which is essentially what the J&OB is trying to do, is that that evidence has to be presented to the court. So as I've taken a position in my response, the city of Rockford profoundly failed in raising that issue in its post-trial motion, and I think on that, on its own, it loses. But I think to your point, to the extent that the court takes a position that, you know, the judge was also there and we can take as a statement that either the evidence and he doesn't think it's against the manifest weight or whatever the judge's specific statement was, I think that that's also true. I accept Judge Young's ruling on that as well. But I think because I handle post-trial motions, if I were to be trying to challenge the verdict on a J&OB, I would have to attach all those transcripts. And I understand there was a reluctance or a reticence to make that part of the record at that point in time because the city of Rockford had expended a great deal of money, I don't doubt, in obtaining those transcripts. However, whenever I have a case, for instance, a medical malpractice case, and I'm going to be challenging the case and the court is going to need to decide based on the transcript, you've got to provide a transcript because that's what those trial judges are doing. If we're going to be taking a position that a post-trial motion is supposed to be a meaningful step in order to allow the circuit court to correct errors, then we need to arm those circuit court judges with that information and not simply then make the transcripts part of the record for purposes of the appeal only so that now we can, with specificity, cite to the trial transcript. I think that's all I have. If the court has any questions. I mean, was there any concern in anything that Judge Young said that would seem to indicate he did not remember anything correctly or he did not remember anything? I won't say with precision, but the issues that were raised, he had incorrect assumptions or recollections?  This was, Judge Young was very, he was with us the whole time and he was there and listening and whenever there were sighs and we had communications or conversations about testimony, he, I'm sure, had great notes because he certainly followed it well. So there's not an issue as to the second component. It's kind of really just a focus on, as we're here today, talking about the importance of following the rules, just like with the 213 disclosure. The suggestion that counsel had, let me back up. You asked whether or not there was sufficient information contained in the 213 disclosure that would have identified the individual and whether or not, what their company was. I believe that there was, but that's not the limitation on the 213 as I indicated before. The 213.3, as it relates to retain experts, is very specific. But that's if, we had a case earlier this morning that I don't think you were here for, where we questioned when the judge does X, does that relieve him or her of doing something else? Here, the judge was trying to get ahead of things and so he ordered this disclosure. Did you ever, though, follow up on that? Did he, in the order, say identify your experts? Did he also say identify their opinions? It's a 213 disclosure is what the order is. Please disclose your 213 witnesses. Okay, and their names were identified. But that's not what 213 says. 213 is more specific than that. So I understand that we now have identifications of who these people are, but I don't think simply because the court orders you to disclose your trial-ready 213s that that obviates the need for compliance with 213 in the way that you answer it. But I do think because the court asked for the disclosure of the 213s, I think it would be redundant for me to then serve a document called a 213 request. But if the information was not included as normally it would be if there was a request, an interrogatory, I guess it's going to be trial strategy, and I suspect that your position was they didn't do it right, the judge is going to recognize that and we'll move on. It didn't work that way because you didn't make the additional request. I understand. I understand. I believe I was entitled to rely on the disclosure. I was entitled to, from a trial strategy standpoint, be able to rely with that 213 disclosure to the extent that it didn't comply with the rule, that I could then say they haven't disclosed the opinions that they're obligated to do. Not infrequently, a lot of what I do is medical malpractice. If there are people that are doing defense and they're dabbling in the medical malpractice, sometimes there are deficient disclosures, and I know that when I get the disclosure from them, whether or not I've served a written discovery request or not, if I tell them I'm not going to take your expert's deposition, I know their heart sinks in that moment because they're like, what did I do wrong? But I don't have to take their deposition. I can rely on that disclosure to be all-inclusive. It should be a standalone document. I think that that's the way it's been intended to be interpreted. So what are they going to get on the stand and say? My name is, again, I can't remember his first name, but let's see. My name is Francis Martinelli, and I work for the Hutchinson Agency. Is that all you believe they could say? Yes. Whatever's been disclosed. And it would be limited to that. So the judge could have either barred their testimony in its entirety or barred all things that weren't specifically disclosed. Mr. Shimmer, your time has expired. So thank you very much. Thank you very much. I'd like to thank both counsel for the quality of the arguments. I think he said he wanted to. Do I respond? Okay. Yes, Judge. Go ahead. Thank you, Judge. I just want to speak specifically to the ‑‑ just briefly on the issue of the 213s again and then go to my summary of the motion, the one argument I didn't address earlier. I think that counsel wants the protection of Rule 213, and to get that protection you have to actually issue 213s. And that's a distinction which the case law that we cited in response to our motion or in support of our argument to the circuit court in which the court acknowledged that this is a court order. And in addition to that, there was a lack of diligence going on there. But then as to my principle argument on the summary judgment, we believe that the reckless infliction of emotional distress claim which plaintiff brought contains a bodily harm requirement. We believe that this is a novel case in the sense that the previous cases that have come before the court on infliction of emotional distress, it's intentional or reckless in any event. It's the person who is the recipient of the reckless conduct. That's the individual who's coming forward with a suit or someone who's related to the person who suffered the exact conduct. And the courts have, not just here in Illinois but around, when assessing whether to accept claims to emotional distress, understand that these are claims that are difficult to independently or objectively establish. Unlike the guy who has the bruise or the burn which can objectively establish if someone says that, oh, I suffered something because of an event which is somehow attenuated, was walking in the street and observed an accident. The courts have essentially said, we need to show us more because if you have no relationship with this individual, you just saw some Joe Average that you don't know, and just because of the conduct of what you observed, you just don't get to recover. There are no cases specifically on point, but I believe, we believe, the city believes that the case law, in addition to the restatement, second of the various restatements that we relied upon, a brief support that summary judgment shall be measured on the reckless infliction of emotional distress claim because the plaintiffs, at this point now, it's just individual plaintiffs and Browns, did not and cannot establish any bodily harm. Well, doesn't psychological, resulting psychological illness, headaches, other physical manifestations, wouldn't that qualify as bodily harm? Ordinarily, they do when the recipient of the extreme outrageous conduct is, the direct recipient is the person bringing the suit, the person who was spoken in a certain way in public with some outrageous language making them feel a certain way, the person who was told that maybe his spouse died and that's not correct and he felt those very psychological manifestations, those, of course, are said, they can recover. But what we have here is a group of plaintiffs who said they were there when something happened. And the concern here is if you have a situation where people are saying, because we're here when something happened, and it equals we recover for psychological harm in the absence of any physical manifestation, and by physical manifestation we're talking about, you know, some sort of high blood pressure which can be objectively determined. We believe it's something that's important, which the courts have been very reluctant to get into. We decided on the case law and our briefs on that issue. But do you have any cases that definitively state they could not recover for the physical manifestations of the psychological harm? No, no, no. We don't have any case directly on point saying that. I thought Mrs. Sheila Brown had gone to see her doctor shortly after the event and ultimately the doctor recommended that she not go back to work for some time. My recollection was she spoke to some sort of counselor, some sort of, if I recall correctly, some sort of counselor, maybe affiliated with the church. She said she felt very badly about what happened, and understandably so. We don't intend to minimize what the plaintiffs felt. But I don't recall, and maybe just in my memory, I don't recall her going to a doctor and telling her to be off work. Thank you very much. If you have any other questions. Good timing. Thank you. All right. Thank you, counsel, for the quality of your arguments. The matter will, of course, be taken under advisement, a written decision well issued in due course. We will stand briefly in recess to prepare for the next case. Thank you. Thank you.